UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RECEIVED
NOV 12 2009
U.S.D.C. S.D. N.Y.
CASHIERS

NEXBANK, SSB, as successor Second Lien
Collateral Agent for the Second Lien Lenders,

                    Plaintiff,

          - against -

LANDESBANK BADEN WURTTEMBERG, NEW
YORK BRANCH, as a first lien lender and as successor
First Lien Collateral Agent, DEUTSCHE
HYPOTHEKENBANK, MUNCHENER
HYPOTHEKENBANK eG, GREAT LAKES
REINSURANCE (UK) PLC, FX LUXURY LAS
VEGAS I, LLC, FX LUXURY LAS VEGAS II, LLC,
FX LUXURY LAS VEGAS PARENT, LLC, FX
REAL ESTATE AND ENTERTAINMENT INC.,
ROBERT F.X. SILLERMAN, PAUL C. KANAVOS,
BRETT TORINO, LIRA PROPERTY OWNER, LLC,
LIRA LLC, GARY McHENRY, MITCHELL J.
NELSON, DAVID M. LEDY, HARVEY
SILVERMAN, MICHAEL J. MEYER, BRYAN E.
BLOOM, JOHN D. MILLER, ROBERT SUDACK,
and JOHN DOES and XYZ Companies 1-10,

                    Defendants.

09 Civ

**09 CIV 9422**

**COMPLAINT**

Judge McMahon

        Plaintiff NexBank, SSB ("NexBank"), by its attorneys Haynes and Boone, LLP, for its

Complaint (the "Complaint") against defendants alleges as follows:

## NATURE OF THE ACTION

        1.      This is a Complaint for, among other things, breach of, and tortious interference

with, an intercreditor agreement dated as of July 6, 2007 (as amended, supplemented or

otherwise modified, the "Intercreditor Agreement"), brought by plaintiff NexBank, in its

capacity as the second lien collateral agent on behalf of the second lien lenders. This Complaint

is filed against the first lien agent, the first lien lenders, the underlying borrowers, and those other persons who have wrongfully and tortiously coordinated a breach of the Intercreditor Agreement by the first lien lenders and the borrowers through their entry into a lock-up agreement dated October 30, 2009 (the "Lock-up Agreement") in contravention of certain contractual rights held by NexBank on behalf of the second lien lenders. The Complaint also seeks a declaratory judgment that: (i) the Lock-up Agreement is a prohibited transaction pursuant to the terms of the Intercreditor Agreement and a breach of that agreement; and (ii) by virtue of defendants' breach of the material and fundamental terms of the Intercreditor Agreement, NexBank and the second lien lenders are no longer bound by the Intercreditor Agreement.

2.     In addition, NexBank asserts derivative causes of action against: (i) the borrowers and certain of the borrowers' managers, members and officers for breach of fiduciary duty related to the borrowers' entry into the Lock-up Agreement; and (ii) the borrowers' parent corporation, FX Real Estate and Entertainment Inc. ("FXRE"), its directors and certain of its officers for aiding and abetting a breach of fiduciary duty related to their conduct leading to the authorization, direction and instruction to the borrowers (FXRE's wholly-owned subsidiaries) to wrongfully enter into the Lock-up Agreement to the detriment, damage and at the expense of the second lien lenders that are creditors of the borrowers, and who are owed fiduciary duties by these defendants.

## THE PARTIES

3.     Plaintiff NexBank is a Texas state savings bank, with its principal place of business in Dallas, Texas. NexBank is the successor-in-interest to Credit Suisse, Cayman Islands Branch ("Credit Suisse"), as second lien collateral agent (the "Second Lien Collateral Agent") under the

Second Lien Credit Agreement (defined in paragraph 35, below) and the Intercreditor Agreement.

4.        Defendant Landesbank Baden-Württemberg - New York Branch ("LBBW"), is a German banking institution with an office in New York, New York.  LBBW is a party to, and is bound by, the Intercreditor Agreement, and is a signatory to the Lock-up Agreement giving rise to the claims set forth herein.  LBBW is sued herein in its individual corporate capacity as a First Lien Lender (defined in paragraph 7, below) and as the successor-in-interest to Credit Suisse, as first lien collateral agent (the "First Lien Collateral Agent") under the First Lien Credit Agreement (defined in paragraph 28, below) and the Intercreditor Agreement.

5.        Defendant Deutsche Hypothekenbank ("DHKB"), a German corporation, is a First Lien Lender, is a party to, and is bound by, the Intercreditor Agreement, and is a signatory to the Lock-up Agreement.  Upon information and belief, DHKB regularly transacts business in New York.

6.        Defendant Munchener Hypothekenbank eG ("MHKB"), a German registered cooperative company, is a First Lien Lender, is a party to, and is bound by, the Intercreditor Agreement, and is a signatory to the Lock-up Agreement.  Upon information and belief, MHKB regularly transacts business in New York.

7.        Upon information and belief, defendant Great Lakes Reinsurance (UK) PLC ("GL," and collectively with LBBW, DHKB and MHKB, the "First Lien Lenders" and each independently, a "First Lien Lender"), is a Public Limited Company based in the United Kingdom.  GL is a First Lien Lender by virtue of an assignment of interest from MHKB dated on or about June 25, 2009, and is therefore a party to, and bound by, the Intercreditor Agreement,

and is also a party to the Lock-up Agreement. Upon information and belief, GL regularly transacts business in New York.

8.      Defendant FX Luxury Las Vegas I, LLC ("FX I") is a Nevada limited liability company with a principal place of business located in Las Vegas, Nevada. FX I, formerly known as Metroflag BP, LLC, is a "Borrower" under the First Lien Credit Agreement, the Second Lien Credit Agreement and the Intercreditor Agreement, and is a wholly-owned subsidiary of FXRE.

9.      Defendant FX Luxury Las Vegas II, LLC ("FX II") is a Nevada limited liability company with its principal place of business located in Las Vegas, Nevada. FX II, formerly known as Metroflag Cable, LLC, is also a "Borrower" under the First Lien Credit Agreement, the Second Lien Credit Agreement and the Intercreditor Agreement, and is also a wholly-owned subsidiary of FXRE.

10.     Defendant FX Luxury Las Vegas Parent, LLC ("FX Parent") is a Delaware limited liability company with a principal place of business located in New York, New York. FX Parent is the successor-in-interest to BP Parent, LLC, named as "Holdings" in the Intercreditor Agreement and is a guarantor and party-in-interest under the Intercreditor Agreement. Upon information and belief, FX Parent is the sole member of defendants FX I and FX II.

11.     Defendant FXRE is a publicly-listed Delaware corporation with a principal place of business located in New York, New York. Upon information and belief, FXRE owns, as its wholly-owned subsidiaries, FX Parent, FX I and FX II.

12.     Upon information and belief, defendant Robert F.X. Sillerman ("Sillerman") is an individual residing in New York, New York. Upon information and belief, Sillerman is, and was

at all relevant times, the Chairman of the Board of Directors and Chief Executive Officer of FXRE, and, as of November 6, 2009, beneficially owns, either individually or through various affiliates, relatives and/or entities which he owns or controls, approximately 42.5% of all common stock of FXRE.

13.    Upon information and belief, defendant Paul C. Kanavos ("Kanavos") is an individual residing in New York, New York. Upon information and belief, Kanavos is, and was at all relevant times, the President and a Director of FXRE, and, as of November 6, 2009, beneficially owns, either individually or through various affiliates, relatives and/or entities which he owns or controls, approximately 29.8% of all common stock of FXRE.

14.    Upon information and belief, defendant Brett Torino ("Torino") is an individual residing in Las Vegas, Nevada. Upon information and belief, Torino is and was, at all relevant times, an officer of FXRE serving as Chairman of FXRE's Las Vegas Division, and, as of November 6, 2009, beneficially owns, either individually or through various affiliates, relatives and/or entities which he owns or controls, approximately 30.6% of all common stock of FXRE.

15.    Upon information and belief, defendant LIRA Property Owner, LLC ("LIRAPO") is a Delaware limited liability company. Upon information and belief, LIRAPO is an entity affiliated with and/or controlled by Sillerman, Kanavos and Torino and was created to implement the transactions complained of in this Complaint.

16.    Upon information and belief, defendant LIRA LLC ("LIRA") is a Delaware limited liability company. Upon information and belief, LIRA is an entity affiliated with and/or controlled by Sillerman, Kanavos and Torino and was created to implement the transactions complained of in this Complaint.

17.     Upon information and belief, defendant Gary McHenry ("McHenry") is an individual residing in Las Vegas, Nevada.  Upon information and belief, McHenry is, and was at all relevant times, the Principal Accounting Officer of FXRE.

18.     Upon information and belief, defendant Mitchell J. Nelson ("Nelson" and together with Sillerman, Kanavos, McHenry and Torino, the "Officer Defendants") is an individual residing in, and/or with a principal place of business in, New York, New York.  Upon information and belief, Nelson is, and was at all relevant times, the Executive Vice President, the General Counsel and the Secretary of FXRE.

19.     Upon information and belief, defendant David M. Ledy ("Ledy") is an individual residing in, and/or with a principal place of business in, New York, New York.  Upon information and belief, Ledy is, and was, at all relevant times, a Director of FXRE.

20.     Upon information and belief, defendant Harvey Silverman ("Silverman") is an individual residing in Morristown, New Jersey.  Upon information and belief, Silverman is, and was at all relevant times, a Director of FXRE, and, as of November 6, 2009, beneficially owns, either individually or through various affiliates, relatives and/or entities which he owns or controls, approximately 4.0% of all common stock of FXRE.

21.     Upon information and belief, defendant Michael J. Meyer ("Meyer") is an individual residing in, and/or has a principal place of business in, New York, New York.  Upon information and belief, Meyer is, and was at all relevant times, a Director of FXRE.

22.     Upon information and belief, defendant Bryan E. Bloom ("Bloom") is an individual residing in Morristown, New Jersey.  Upon information and belief, Bloom is, and was at all relevant times, a Director of FXRE as the board designee of The Huff Alternative Fund,

L.P. ("Huff"), a beneficial owner (either directly or through affilates) of approximately 11.2% of all common stock of FXRE.

23.    Upon information and belief, defendant John D. Miller ("Miller") is an individual residing in, and/or having a principal place of business in, New York, New York. Upon information and belief, Miller is, and was at all relevant times, a Director of FXRE.

24.    Upon information and belief, defendant Robert Sudack ("Sudack" and collectively with Sillerman, Kanavos, Silverman, Meyer, Bloom, Ledy and Miller, the "Director Defendants"; and the Director Defendants collectively with the Officer Defendants, the "Individual Defendants") is an individual residing in, and/or having a principal place of business in, New York, New York. Upon information and belief, Sudack is, and was at all relevant times, a Director of FXRE.

25.    John Does and XYZ Companies 1 - 10 (the "Additional Parties") are persons and legal entities constituting the members and managers of the underlying borrowers – who aided and abetted, benefited from, or otherwise participated in the wrongful acts alleged in this Complaint. The identity of the Additional Parties is not yet known and will be determined through the course of discovery in this action.

## JURISDICTION AND VENUE

26.    Jurisdiction is proper pursuant to 28 U.S.C. §1332(a) as this action is between citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest and costs. In addition, each of the First Lien Agent and First Lien Lenders agreed to submit to the jurisdiction of this Court pursuant to the clear and express terms of the Intercreditor Agreement.

27.    Venue is appropriate in this District pursuant to 28 U.S.C. §1391(a), and by virtue of the agreement of the parties expressly provided for in the Intercreditor Agreement.

# FACTS RELEVANT TO THE CLAIMS FOR RELIEF

## The First Lien Loan

28.     Pursuant to an agreement dated May 11, 2007, and amended and restated on July 6, 2007 (as amended, supplemented or otherwise modified, the "First Lien Credit Agreement"), between BP Parent, LLC, Metroflag BP, LLC and Metroflag Cable, LLC (collectively, with their respective successors-in-interest as detailed herein, the "Borrowers"), the First Lien Lenders, and Credit Suisse as the First Lien Administrative Agent and the First Lien Collateral Agent for the First Lien Lenders, the First Lien Lenders made a loan of $280,000,000 (the "First Lien Loan") to the Borrowers.

29.     Under terms of the First Lien Credit Agreement, the Borrowers agreed to repay the entire principal amount thereof, unpaid interest thereon, and all other amounts owed thereunder, on or before July 6, 2008.

30.     Pursuant to Section 2.12 of the First Lien Credit Agreement the Borrowers extended the maturity of the First Lien Loan to January 6, 2009 (the "Maturity Date").

31.     The First Lien Loan is secured by, *inter alia*, a deed of trust on real property located in Las Vegas, Nevada (the "Collateral"), pursuant to a First Lien Deed of Trust, a Security Agreement, an Assignment of Rents and Leases and a Fixture Filing executed by the Borrowers on May 11, 2007 (the "First Lien Trust Deed").

32.     On or about April 9, 2009, Nevada Title Company (the "First Lien Trustee"), a Nevada corporation, was substituted in place of First American Title Insurance Company, the original Trustee under the First Lien Trust Deed.

33. Among other things, pursuant to the First Lien Trust Deed, the Borrowers granted the First Lien Trustee a power of sale in all of Borrowers' real property of which LBBW, on behalf of the First Lien Lenders, would be the beneficiary.

34. On or about December 22, 2008, LBBW became the successor-in-interest to Credit Suisse as the First Lien Collateral Agent and, upon information and belief, is the current beneficiary under the First Lien Trust Deed.

The Second Lien Loan

35. Pursuant to an agreement dated May 11, 2007, and amended and restated on July 6, 2007 (as amended, supplemented or otherwise modified, the "Second Lien Credit Agreement"), by and among the Borrowers, the lenders party thereto from time to time (collectively, the "Second Lien Lenders") and Credit Suisse, Cayman Islands Branch, serving as the Second Lien Administrative Agent and Second Lien Collateral Agent, the Second Lien Lenders extended a secured second lien loan in the amount of $195,000,000 (the "Second Lien Loan") to the Borrowers.

36. The Second Lien Loan was secured by, *inter alia*, a second deed of trust on the Collateral. As with the First Lien Loan, the Second Lien Loan was scheduled to mature on the Maturity Date.

The Intercreditor Agreement

37. On or about July 6, 2007, the Borrowers, Credit Suisse, acting as both the First Lien Collateral Agent and the Second Lien Collateral Agent, and BP Parent, LLC, entered into the Intercreditor Agreement. A true and correct copy of the Intercreditor Agreement is annexed hereto as Exhibit "A," and is incorporated by reference herein.

38. The Intercreditor Agreement governs the rights and obligations between the First Lien Collateral Agent, on behalf of itself and the First Lien Lenders, and the Second Lien Collateral Agent, on behalf of itself and the Second Lien Lenders, including lien priorities and the enforcement of remedies with respect to the Collateral securing the obligations.

39. The parties to the Intercreditor Agreement acknowledged that the First Lien Loan is "secured on a first priority basis by liens on substantially all the assets" of the Borrowers, while the Second Lien Loan is "secured on a second priority basis" by liens in the same assets, namely, the Collateral.

40. The First Lien Lenders and the Second Lien Lenders further agreed that until the discharge of the First Lien Loan obligations in full:

(i) the First Lien Collateral Agent or the First Lien Lenders could enforce rights and exercise remedies without consulting the Second Lien Collateral Agent or the Second Lien Lenders;

(ii) the Second Lien Collateral Agent and the Second Lien Lenders could not enforce rights and exercise remedies except after a certain standstill period, and only if the First Lien Agent or the First Lien Lenders were not diligently enforcing rights and exercising remedies;

(iii) the Second Lien Collateral Agent and the Second Lien Lenders could not "contest, protest, or object to" any foreclosure proceeding or action brought by the First Lien Collateral Agent or the First Lien Lenders, or "any other exercise" by the latter "of any rights and remedies relating to the Collateral"; and

(iv)     upon an exercise of remedies, the Collateral and any proceeds thereof shall first be applied in accordance with the First Lien Loan documents, and, upon discharge of that First Lien Loan, in accordance with the Second Lien Loan documents.

(*See* Ex. A, the Intercreditor Agreement, Section 3.1.)

41.     Based upon the fact that the First Lien Lenders could exercise their remedies first and, potentially, exhaust all of the Collateral in satisfaction of the First Lien Loan, it was of material and fundamental importance to the Second Lien Lenders that the Intercreditor Agreement expressly protect the Second Lien Lenders against any modification, refinancing, replacement or substitution of the First Lien Debt beyond the scheduled Maturity Date of the Second Lien Credit Agreement.

42.     Specifically, Section 5.3 of the Intercreditor Agreement protects the Second Lien Lenders' rights by precluding the First Lien Lenders from, *inter alia*, modifying or refinancing the First Lien Loan in a manner which would extend the First Lien Credit Agreement or result in a refinancing of the First Lien Loan beyond the Maturity Date as follows:

> 5.3 <u>Amendments to First Lien Loan Documents and Second Lien Loan Documents</u>.
>
> (a) The First Lien Loan Documents [including the First Lien Credit Agreement] may be Modified[1] in accordance with their terms and the First Lien Credit Agreement may be Refinanced[2] . . . <u>provided</u> that . . . any such Modification, replacement or Refinancing shall not:
>
> > (1)     contravene the provisions of this Agreement; . . .

---

[1] *Modifications* are defined in the Intercreditor Agreement as "any amendments, restatements, amendments and restatements, supplements, modifications, waivers, renewals, replacements, consolidations, severances, substitutions and extensions, of any document or instrument from time to time; 'Modify', 'Modified', or related words shall have meanings correlative thereto." (*See*, Intercreditor Agreement, Section 1.1 at p. 5.)

[2] *Refinance* is defined in the Intercreditor Agreement as "in respect of any Indebtedness [(defined as obligations under the First Lien Credit Agreement and the Second Lien Credit Agreement)], to refinance, extend, renew, restructure or replace or to issue other Indebtedness in exchange or replacement for, such Indebtedness, in whole or in part. 'Refinanced' and 'Refinance' have meanings correlative thereto." (*See*, Intercreditor Agreement, Section 1.1 at p. 6.)

(4)     extend the scheduled maturity of the First Lien Credit Agreement or any Refinancing thereof beyond the scheduled maturity of the Second Lien Credit Agreement or any permitted Refinancing thereof . . . .

(*See* Ex. A, the Intercreditor Agreement, Section 5.3 at pp. 14-15.)

43.     The Second Lien Collateral Agent and the Second Lien Lenders relied on these material protective provisions of the Intercreditor Agreement to balance the rights and powers afforded to the First Lien Lenders thereunder.

LBBW's Appointment of a State Court Receiver

44.     Prior to the Maturity Date, LBBW, in its capacity as First Lien Collateral Agent, took action against the Borrowers by taking control of the Borrowers' cash and directing that all tenants pay all rent and other obligations directly to a new designated account set up by LBBW.

45.     In addition, prior to the Maturity Date, LBBW conducted a review of the Borrowers' books and records to validate the accuracy of those books and the legitimacy and reasonableness of expenditures made by the Borrowers from revenue generated by the Collateral.

46.     Upon information and belief, LBBW found that certain of the expenses paid by the Borrowers were not reasonable and not related to the operation of the Collateral.  As discussed below, following the Maturity Date, LBBW used these findings to support their complaint to appoint a state court receiver to take control of the property out of the Borrowers' pending foreclosure sale.

47.     In furtherance of the exercise of rights accorded the First Lien Agent under the First Lien Credit Agreement, on or about June 5, 2009, LBBW filed a complaint in the District Court, Clark County, Nevada (the "LBBW Complaint"), to have a state court receiver appointed to take possession and control of the Collateral.  A true and correct copy of the LBBW Complaint is annexed hereto as Exhibit "B" and is incorporated by reference herein.

48.     On June 12, 2009, LBBW filed a Supplement to Plaintiff's Petition for Appointment of Receiver, on Order Shortening Time (the "LBBW Supplemental Complaint").  A true and correct copy of the LBBW Supplemental Complaint is annexed hereto as Exhibit "C" and is incorporated by reference herein.

49.     The LBBW Supplemental Complaint alleges the following:

> Plaintiffs Petition set for hearing on June 15, 2009 already presents evidence regarding [the Borrowers'] prior excessive management charges and mismanagement of the Real Property and the commercial leasehold interests thereon. However, since the filing of the Petition, Plaintiff has obtained further evidence that: (1) Borrower's management expenses are excessive; (2) the Real Property's Net Operating Income ("NOI") continues to diminish under Borrower's management; and (3) Borrower's management of the Real Property has been substandard and improper such that: (i) portions of the Real Property are in dangerous and unsafe physical condition; and (ii) the value of the individual leasehold interests on the Real Property and the security interest itself are being endangered.

(*See*, Ex. C, LBBW Supplemental Complaint at p. 2.)

50.     On June 23, 2009, following its review and consideration of, among other things, the LBBW Complaint and the LBBW Supplemental Complaint, the District Court, Clark County, Nevada found the Borrowers' annualized expenses to be "excessive" and entered an order (the "Receiver Order") appointing a court-appointed receiver and granting the receiver exclusive possession and control over the Collateral pending foreclosure.  A true and correct copy of the Receiver Order is annexed hereto as Exhibit "D" and is incorporated by reference herein.

The Breach of the Intercreditor Agreement

51.     The First Lien Loan matured on the Maturity Date and remains unpaid.  As a result, interest, costs and fees continue to accrue against the Borrowers on the First Lien Loan.

52.     The Second Lien Loan matured on the Maturity Date and remains unpaid.  As a result, interest, fees and costs continue to accrue against the Borrowers on the Second Lien Loan.

53. The failure to pay the First Lien Loan and the Second Lien Loan by the Maturity Date constituted events of default by the Borrowers under both the First Lien Credit Agreement and the Second Lien Credit Agreement.

54. A foreclosure sale of the Collateral by the First Lien Trustee on behalf of LBBW was originally scheduled for September 9, 2009.

55. On or about September 2, 2009, LBBW, on behalf of the First Lien Lenders, agreed to adjourn the sale of the collateral by the First Lien Trustee from September 9, 2009, to October 21, 2009.

56. On or about October 15, 2009, LBBW, on behalf of the First Lien Lenders, agreed to further adjourn the scheduled sale of the Collateral from October 21, 2009, to November 18, 2009.

57. Upon information and belief, immediately prior to and throughout the period during which LBBW has agreed to adjourn the scheduled sale of the Collateral (the "Foreclosure Period"), LBBW, on behalf of itself and the First Lien Lenders, began negotiating with the Borrowers, FX Parent (as "Holdings" under the Intercreditor Agreement), Sillerman, Kanavos and Torino (all of whom are insiders of FXRE) to Refinance the debt due under the First Lien Credit Agreement and to modify the terms of such debt by extending the maturity of the First Lien Credit Agreement beyond the Maturity Date in direct violation of the Intercreditor Agreement.

58. Upon learning of the negotiations between LBBW, the Borrowers, FX Parent and the various insiders, counsel for NexBank advised the First Lien Lenders' counsel, Shearman & Sterling LLP, both orally and in writing that the First Lien Lenders were prohibited from negotiating any agreements in violation of, or which otherwise circumvented, Section 5.3 of the Intercreditor Agreement. A true and correct copy of a letter sent to counsel for the First Lien Lenders by counsel for NexBank is attached hereto as Exhibit "E."

59.     Upon information and belief, during the Foreclosure Period, defendants Sillerman, Kanavos and Torino engaged in discussions with members of the Borrowers' management committees, other members of FXRE's Board of Directors (including, without limitation, the Director Defendants), and certain officers including, but not limited to, the Officer Defendants, relating to a contemplated agreement with LBBW and the other First Lien Lenders providing for the Borrowers' commencement of a voluntary pre-packaged Chapter 11 bankruptcy case and sale of the Collateral either by auction for a sum equal to or greater than $256 million or by a pre-arranged sale to LIRAPO for the sum of $260 million, which purchase price would be financed by LBBW and the other First Lien Lenders. These terms ultimately formed the basis for the Lock-up Agreement.

60.     The debt created by the planned sale of the Collateral to LIRAPO through financing provided by LBBW and the other First Lien Lenders is nothing more than a Modification and/or a Refinancing, as defined in the Intercreditor Agreement,[3] of the existing First Lien Debt in direct breach and contravention of Section 5.3 of the Intercreditor Agreement, and is a sham and end-run effort to circumvent the clear prohibitions against such a transaction contained in the Intercreditor Agreement.

61.     Upon information and belief, prior to and during the Foreclosure Period, all of the Defendants were aware of the existence of the Intercreditor Agreement and the provisions contained therein.

62.     The Borrowers were insolvent both prior to and throughout the duration of their discussions with defendants LBBW, Sillerman, Kanavos and Torino during the Foreclosure Period. Accordingly, the Borrowers, and their managers and members owed a fiduciary duty to all creditors of the Borrowers including, but not limited to, the Second Lien Lenders.

---

[3] *See* footnotes 2 and 3 *supra.*

63. Upon information and belief, despite their knowledge that the implementation of the Lock-up Agreement would wipe out the Second Lien Lenders *in toto* and would constitute a breach of the Intercreditor Agreement, on or before October 30, 2009, the Individual Defendants authorized, directed and/or instructed the Borrowers (who were fiduciaries) to enter into the Lock-up Agreement.

64. On or about October 30, 2009, LBBW, the Borrowers and Holdings entered into the Lock-up Agreement with LIRAPO and LIRA, both of which are owned by Sillerman, and Kanavos.

65. Upon information and belief, Sillerman, Kanavos and Torino are directors, executive officers and/or control as beneficial owners of approximately 73% of FXRE. Sillerman, Kanavos and Torino directed the actions of FXRE (via its "disinterested" directors) and the Borrowers in entering the Lock-up Agreement which provides for the sale of the Collateral to their controlled entities, LIRAPO and LIRA. As a result, instead of permitting the Borrowers and the Second Lien Lenders to share in the upside of the Collateral, Sillerman, Kanavos and Torino have in bad faith usurped this opportunity for themselves and the First Lien Lenders, wiping out the interests of the Borrowers and the claims of the Second Lien Lenders in the process.

66. The entry into and execution of the Lock-up Agreement is a prohibited refinancing of the First Lien Debt by LBBW and the other First Lien Lenders pursuant to Section 5.3 of the Intercreditor Agreement which extends the maturity of the First Lien Loan beyond the Maturity Date in clear breach and violation of the Intercreditor Agreement.

67. Upon information and belief, the breach of the Intercreditor Agreement was done with intent to harm the Second Lien Lenders by stripping them of the protections afforded them under the Intercreditor Agreement.

68.     The Lock-up Agreement also has the effect of ceding control of the Collateral to the same parties LBBW previously ousted when it sought the appointment of a State Court receiver due to their "excessive management charges and mismanagement."

69.     On November 5, 2009, FXRE filed a Form 8-K with the United States Securities and Exchange Commission. The Form 8-K, dated as of October 30, 2009, was filed to report the entry into and execution of the Lock Up Agreement. A true and correct copy of the Form 8-K is annexed hereto as Exhibit "F" and is incorporated by reference herein.

70.     Specifically, the Form 8-K provides in part:

> On October 30, 2009, FX Real Estate and Entertainment Inc. s [sic] (the "Company") Las Vegas subsidiaries entered into a Lock Up and Plan Support Agreement (the "Lock Up Agreement") with the first lien lenders under the Las Vegas subsidiaries $475 million mortgage loans, and two corporate affiliates (LIRA Property Owner, LLC and its parent LIRA LLC; collectively, the "Newco Entities") of Robert F.X. Sillerman, Paul C. Kanavos and Brett Torino, who are directors, executive officers and/or greater than 10% stockholders of the Company (the "Newco Entities Equity Sponsors").

(*See*, Ex. F, Form 8-K at Item 1.01, p. 1.)

71.     The Form 8-K goes on to describe the terms and provisions of the Lock-up Agreement and the proposed sale of the Collateral and alternative plan of liquidation to be implemented by LBBW and the other First Lien Lenders who will be providing refinancing, substitute and replacement debt for the existing First Lien Debt on the Collateral.

72.     The Form 8-K further describes the complicity of the " disinterested directors" of FXRE by describing their conduct as follows:

> Because the Lock Up Agreement and the transactions contemplated thereby involve the Newco Entities Equity Sponsors, who are directors, executive officers and/or greater than 10% stockholders of the Company, a majority of the Company s disinterested directors authorized the Las Vegas subsidiaries to

enter into the Lock Up Agreement and consummate the transactions contemplated thereby.

(*See*, Ex. F, Form 8-K at Item 1.01, p. 2.)

73.     As described in the Form 8-K, the Borrowers and FXRE through its "disinterested directors" acted to facilitate the Lock-up Agreement for no consideration whatsoever. Indeed, the Form 8-K provides that the interests of the Borrowers along with the Second Lien Lenders will be extinguished *in toto* by virtue of the actions taken by the various parties to the Lock-up Agreement.

## COUNT I

### BREACH OF CONTRACT
**(Against Defendants LBBW as First Lien Collateral Agent, the First Lien Lenders, FX Parent, FX I and FX II)**

74.     NexBank repeats the allegations contained in paragraphs 1 through 73 of the Complaint as if fully set forth herein.

75.     The Intercreditor Agreement constituted a binding and enforceable contract, supported by adequate consideration.

76.     NexBank has fulfilled all of its obligations under the Intercreditor Agreement.

77.     As described above, defendants LBBW as First Lien Collateral Agent, the First Lien Lenders, FX Parent, FX I and FX II have materially breached the Intercreditor Agreement by, *inter alia*, entering into the Lock-up Agreement which Refinances or Modifies the terms of the First Lien Credit Agreement, in violation of the terms of Section 5.3 of the Intercreditor Agreement.

78.     As a direct and proximate result of defendants LBBW as First Lien Collateral Agent, the First Lien Lenders, FX Parent, FX I and FX II's material breaches of the Intercreditor Agreement, NexBank and the Second Lien Lenders have been damaged, in an amount to be determined at trial, but in no event less than $216,000,000, plus interest, costs and expenses,

including, without limitation, an award for its attorney's fees pursuant to section 9.2(a) of the Second Lien Credit Agreement.

## COUNT II

### TORTIOUS INTERFERENCE WITH CONTRACT
**(Against Defendants LIRA, LIRAPO, the Individual Defendants)**

79.     NexBank repeats the allegations contained in paragraphs 1 through 78 of the Complaint as if fully set forth herein.

80.     NexBank maintained a valid contract, the Intercreditor Agreement, with LBBW as First Lien Collateral Agent, the First Lien Lenders, FX Parent, FX I and FX II.

81.     LIRA, LIRAPO, and the Individual Defendants had knowledge of the Intercreditor Agreement and its terms.

82.     Defendants LIRA, LIRAPO and the Individual Defendants intentionally sought to induce LBBW as First Lien Collateral Agent, the First Lien Lenders, FX Parent, FX I and FX II to breach the Intercreditor Agreement with NexBank by entering into the Lock-up Agreement, which effectively Refinances or Modifies the terms of the First Lien Credit Agreement in breach of the Intercreditor Agreement.

83.     Upon information and belief, in seeking to induce LBBW as First Lien Collateral Agent, the First Lien Lenders, FX Parent, FX I and FX II to breach the Intercreditor Agreement with NexBank, LIRA, LIRAPO, and the Individual Defendants acted with malicious purpose and/or dishonest, unfair or improper means to harm NexBank and the Second Lien Lenders.

84.     In seeking to induce LBBW as First Lien Collateral Agent, the First Lien Lenders, FX Parent, FX I and FX II to breach the Intercreditor Agreement with NexBank, LIRA, LIRAPO, and the Individual Defendants used, *inter alia,* the tortious conduct alleged herein.

85.    As detailed herein, LBBW as First Lien Collateral Agent, the First Lien Lenders, FX Parent, FX I and FX II breached the Intercreditor Agreement by entering into the Lock-up Agreement.

86.    As a direct and proximate result of defendants LIRA, LIRAPO, and the Individual Defendants' unlawful conduct, NexBank and the Second Lien Lenders have been injured in an amount to be proven at trial but in no event less than $216,000,000, plus interest, costs and expenses, including, without limitation, an award for its attorney's fees pursuant to section 9.2(a) of the Second Lien Credit Agreement.

## COUNT III

### BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
(Against Defendants LBBW as First Lien Collateral Agent, the First Lien Lenders, FX PARENT, FX I and FX II)

87.    NexBank repeats the allegations contained in paragraphs 1 through 85 of the Complaint as if fully set forth herein.

88.    NexBank and defendants LBBW as First Lien Collateral Agent, the First Lien Lenders, FX Parent, FX I and FX II entered into the Intercreditor Agreement.

89.    Defendants LBBW as First Lien Collateral Agent, the First Lien Lenders, FX Parent, FX I and FX II owed NexBank the duty to act in good faith and with fair dealing that inheres in every contract, and specifically through the provisions of the Intercreditor Agreement.

90.    Defendants LBBW as First Lien Collateral Agent, the First Lien Lenders, FX Parent, FX I and FX II breached this duty by, *inter alia*, entering into the Lock-up Agreement, which effectively Refinances or Modifies the terms of the First Lien Credit Agreement, as those terms are defined by the Intercreditor Agreement, by extending the maturity of the First Lien Credit Agreement beyond the Maturity Date in violation of the Intercreditor Agreement.

91. As a direct and proximate result of the foregoing breach of the implied covenant of good faith and fair dealing, NexBank has suffered actual damages and will suffer damages in an amount to be proven at trial but in no event less than $216,000,000, plus interest, costs and expenses, including, without limitation, an award for its attorney's fees under section 9.2(a) of the Second Lien Credit Agreement.

## COUNT IV

### DECLARATORY JUDGMENT
**(Against Defendants LBBW as First Lien Collateral Agent, the First Lien Lenders, FX Parent, FX I and FX II)**

92. NexBank repeats the allegations contained in paragraphs 1 through 91 of the Complaint as if fully set forth herein.

93. Pursuant the terms and conditions of Section 5.3 of the Intercreditor Agreement, LBBW as First Lien Collateral Agent, the First Lien Lenders, FX Parent (as "Holdings") and the Borrowers are prohibited from entering into agreements to Modify or Refinance of the First Lien Loan in a manner which would extend the First Lien Credit Agreement or result in a Refinancing or Modification of the First Lien Loan beyond the Maturity Date. Section 5.3 of the Intercreditor Agreement was a material and fundamental term thereof.

94. Despite this prohibition, as described above, defendants LBBW as First Lien Collateral Agent, the First Lien Lenders, FX Parent, FX I and FX II have entered into the Lock-up Agreement, which effectively Modifies or Refinances the First Lien Loan in a manner that extends the First Lien Credit Agreement and is a Refinancing or Modification of the First Lien Debt beyond the Maturity Date and constitutes a material and fundamental breach of the Intercreditor Agreement.

95. Upon information and belief, defendants LBBW as First Lien Collateral Agent, the First Lien Lenders, FX Parent, FX I and FX II dispute NexBank's contention that their entrance into the Lock-up Agreement constitutes a breach of the Intercreditor Agreement.

96. On account of the foregoing, there now exists between NexBank and defendants LBBW as First Lien Collateral Agent, the First Lien Lenders, FX Parent, FX I and FX II a present, actual, justiciable and genuine controversy in respect of which NexBank is entitled to have a declaration of its rights and further relief as may be just and proper.

97. By reason of the foregoing, NexBank is entitled to have judgment entered pursuant to 28 U.S.C. § 2201 *et seq.*, declaring that: (i) the Lock-up Agreement constitutes a prohibited transaction pursuant to the terms of the Intercreditor Agreement and, as a result, is a breach of the Intercreditor Agreement; and that (ii) by virtue of defendants' LBBW, as First Lien Collateral Agent, the First Lien Lenders, FX Parent, FX I and FX II's breach of the material and fundamental terms of the Intercreditor Agreement, NexBank is no longer bound by the Intercreditor Agreement.

## COUNT V
### BREACH OF FIDUCIARY DUTY
#### (Delaware Law)
**(Against Defendants FXI, FX II, the Individual Defendants and the Additional Parties)**

98. NexBank repeats the allegations contained in paragraph 1 through 97 of the Complaint as if fully set forth herein.

99. The Borrowers are insolvent and have been insolvent during all relevant periods complained of herein.

100. During the Borrowers' period of insolvency, FX I, FX II, their respective managers and members, the Individual Defendants, and the Additional Parties owed and continue to owe fiduciary duties of care and/or loyalty to their creditors including, but not limited to, the Second Lien Lenders.

101.    As detailed herein, despite owing this fiduciary duty of care and/or loyalty, FX I, FX II, their respective managers and members, the Individual Defendants, and the Additional Parties breached their fiduciary duties to the Second Lien Lenders by, *inter alia*: (i) committing acts of misconduct such as corporate waste, self-dealing and disloyalty, without excuse; (ii) not acting as reasonably prudent business persons in considering all the information available under the circumstances as alleged herein; (iii) failing to act on an informed basis which took into account the interests of all of FX I and FX II's creditors; and (iv) choosing to authorize and/or otherwise act as directed by FXRE and its "disinterested directors," and as other insiders of FXRE mandated by directing, authorizing and/or otherwise compelling the Borrowers to enter into the Lock-up Agreement in total disregard of the interests of FX I and FX II's creditors.

102.    In light of the allegations contained herein, including the allegations of self-dealing against the defendant fiduciaries, it would be futile to make demand upon them to commence a lawsuit asserting the derivative claims set forth herein against themselves.

103.    This conduct of FX I, FX II, their respective members and managers, the Individual Defendants, and the Additional Parties proximately caused the Second Lien Lenders to suffer actual and consequential damages in an amount to be determined at trial but in no event less than $216,000,000, for which FX I, FX II, their respective members and managers, the Individual Defendants, and the Additional Parties are liable.

## COUNT VI

### AIDING AND ABETTING A BREACH OF FIDUCIARY DUTY
(Delaware Law)
(FXRE, the Individual Defendants, and the Additional Parties)

104.    NexBank repeats the allegations contained in paragraphs 1 through 103 of the Complaint as if fully set forth herein.

105. As described herein, on information and belief, FXRE, each and every officer of FXRE and the members of FXRE's Board of Directors, including, but not limited to, defendants Sillerman, Kanavos and Torino, had actual knowledge of the fiduciary duties owed by the Borrowers and their managers and/or directors to the Second Lien Lenders and that the entry into the Lock-up Agreement for no consideration would be a breach of such duties.

106. As described herein, on information and belief, despite such knowledge, FXRE, each and every officer of FXRE and the members of FXRE's Board of Directors, including, but not limited to, defendants Sillerman, Kanavos and Torino authorized, directed, assisted and/or compelled the Borrowers and their managers and/or directors to breach their fiduciary duties to the Second Lien Lenders by directing them to execute the Lock-up Agreement for no consideration, and without any indication of their independent exercise of business judgment or consideration of their fiduciary duties to the Borrowers' creditors.

107. The actions of FXRE, the Individual Defendants, and the Additional Parties aided and abetted breaches of fiduciary duties by FX I and FX II and their respective managers and members including, without limitation, certain of the Individual Defendants and the Additional Parties.

108. The aforementioned conduct of defendants FXRE, the Individual Defendants and the Additional Parties proximately caused damages to NexBank and the Second Lien Lenders in an amount to be determined at trial but in no event less than $216,000,000, for which said defendants are liable.

## PRAYER FOR RELIEF

**WHEREFORE**, NexBank demands judgment thereon be rendered as follows:

(A)  On Count I for Breach of Contract as against LBBW as First Lien Collateral Agent, the First Lien Lenders , FX Parent , FX I and FX II, damages in an amount to be proven at trial but in no event less than $216,000,000, plus interest, costs and expenses, including, without limitation, an award for NexBank's attorney's fees under pursuant to 9.2(a) of the Second Lien Credit Agreement;

(B)  On Count II for Tortious Interference with Contract as against defendants LIRA, LIRAPO, and the Individual Defendants, awarding plaintiff damages in an amount to be proven at trial but in no event less than $216,000,000, plus interest, costs and expenses, including, without limitation, an award of NexBank's attorney's fees pursuant to section 9.2(a) of the Second Lien Credit Agreement;

(C)  On Count III for Breach of the Implied Covenant of Good Faith and Fair Dealing as against defendants LBBW as First Lien Collateral Agent, the First Lien Lenders, FX Parent, FX I and FX II, damages in an amount to be proven at trial but in no event less than $216,000,000, plus interest, costs and expenses, including, without limitation, an award of NexBank's attorney's fees pursuant to section 9.2(a) of the Second Lien Credit Agreement;

(D)  On Count IV for Declaratory Judgment as against defendants LBBW as First Lien Collateral Agent, the First Lien Lenders, FX Parent, FX I and FX II judgment entered pursuant to 28 U.S.C. § 2201 *et seq.*, declaring that: (i) LBBW as First Lien Collateral Agent, the First Lien Lenders, FX Parent, FX I and FX II are prohibited from entering into any agreements which would modify or refinance the First Lien Loan in a manner which would extend the First Lien Credit Agreement or result in a refinancing of the First Lien Loan beyond the Maturity Date; (ii) that said

parties breached the Intercreditor Agreement by entering the Lock-up Agreement; and (iii) that by virtue of the material breach of the Intercreditor Agreement as alleged herein, NexBank and the Second Lien Lenders are no longer bound by the Intercreditor Agreement;

(E)     On Count V for Breach of Fiduciary Duty as against defendants FX I, FX II, the Individual Defendants and the Additional Parties, damages in an amount to be proven at trial but in no event less than $216,000,000 for which FX I, FX II, their members and managers, the Individual Defendants and the Additional Parties are liable;

(F)     On Count VI for Aiding and Abetting a Breach of Fiduciary Duty as against defendants FXRE, the Individual Defendants and the Additional Parties, damages in an amount to be proven at trial but in no event less than $216,000,000, plus punitive damages, for which FXRE, the Individual Defendants and the Additional Parties are liable;

(G)     Awarding plaintiff punitive damages to the full extent permitted by law as a result of defendants' willful and malicious conduct complained of herein including, without limitation, the conduct complained of in Counts II, IV, V and VI, above;

(H)     Awarding plaintiff pre- and post-judgment interest;

(I)     Awarding plaintiff attorneys fees and costs (to the extent allowed by law and not previously requested herein); and

(J)    For such other and further relief as this Court may deem just and proper.

Dated:   New York, New York
         November 12, 2009

HAYNES AND BOONE, LLP
*Attorneys for Plaintiff NexBank*

By: _____

Lenard M. Parkins (LP-1703)
Jonathan D. Pressment (JP-1819)
Trevor Hoffmann (TH-5876)
1221 Avenue of the Americas, 26th Floor
New York, New York 10020
Telephone:  (212) 659-7300
Facsimile:  (212) 884-8226

NY-28521